**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| DIANE FERRO, derivatively on behalf of FUTURE FINTECH GROUP INC.,<br><br>Plaintiff,<br><br>vs.<br><br>SHANCHUN HUANG, JING CHEN, MING YI, FUYOU LI, YING LI, JOHNSON LAU, and MINGJIE ZHAO,<br><br>Defendants,<br><br>and<br><br>FUTURE FINTECH GROUP INC.,<br><br>Nominal Defendant. | Case No.: 2:26-cv-14493<br><br>**DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Diane Ferro ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Future FinTech Group Inc. ("Future FinTech" or the "Company"), files this Verified Shareholder Derivative Complaint against Shanchun Huang ("Huang"), Jing Chen ("Chen"), Ming Yi ("Ming"), Fuyou Li ("F. Li "), Ying Li ("Y. Li"), Johnson Lau ("Lau"), and Mingjie Zhao ("Zhao") (collectively, the "Individual Defendants," and together with Future FinTech, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Future FinTech, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and against Defendants Huang, Chen and Yi for contribution under Sections 10(b) and 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon,

*inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Future FinTech, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from March 10, 2020, and January 11, 2024, inclusive (the "Relevant Period").

2. The Company was initially incorporated under the name Cyber Public Relations, Inc. In 2008, the Company became an indirect holding company for SkyPeople Juice Group Co. Ltd., and changed its name to SkyPeople Fruit Juice, Inc. Following this corporate alteration, the Company engaged in the production and sale of fruit juice concentrates. However, in response to increased production cost and environmental laws in China, the Company transformed once again and began to focus on providing financial technology related services. To reflect this change in operations, in 2017 the Company changed its name again to Future FinTech.

3. On November 4, 2019, the Nasdaq Global Market ("Nasdaq") informed the Company that Future FinTech faced a potential delisting due to a failure to maintain a stock price of above $1.00 per share. The letter also informed Future Fintech of an 180-day period in which it could regain compliance without being delisted.

4. According to Nasdaq, the potential impact of such an event is detailed as a "significant event in the life cycle of a publicly traded company and has far-reaching implications

for investors." Delisting can be viewed as warning of "serious issues within [a] company, and can lead to significant market uncertainty and a loss of investor confidence."

5. While the Company was in danger of being delisted from Nasdaq, its Former Chief Executive Officer ("CEO") YongKe Xue ("Xue") reached out to Defendant Huang about becoming the CEO of Future FinTech in late 2019 or early 2020. At approximately the same time, Defendant Huang bought hundreds of thousands of thousands of shares of Future Fintech stock via his personal offshore securities account held by HSBC Holdings PLC ("HSBC"). Under a veil of secrecy, from January 13, 2020 through March 4, 2020, Defendant Huang bought 500,379 shares of the Company's stock.

6. Defendant Huang's transactions of Company stock followed a consistent pattern in which he would trade large volumes of Future FinTech stock on particular dates, representing significant percentages of the Company's total trading volume on those days. In addition, Defendant Huang frequently purchased Company stock at higher prices than typical investors would pay. The main purpose of these trading tactics was to artificially inflate Future FinTech's stock price.

7. Following Defendant Huang's manipulative techniques to artificially raise the stock price of Future FinTech, the Company announced on April 16, 2020 that it regained compliance with Nasdaq rule 5550(a)(2) by successfully maintaining a stock price closing bid of above $1.00 for ten consecutive days.

8. Notably, Defendant Huang also provided loans to Future FinTech on several occasions to pay rent and employee wages. These loans were funded directly from the proceeds of Defendant Huang's stock manipulations.

9. Throughout the Relevant Period, Defendant Huang and the other Individual

Defendants issued false statements that sought to hide the truth of Defendant Huang's manipulative trading tactics. Notably, these statements highlighted Defendant Huang's experience and the reason for his hiring, but released no information regarding the large-scale stock manipulation he took part in.

10. For instance, on March 10, 2020, the Company issued a press release announcing the appointment of Defendant Huang as its new CEO, entitled "Future Fintech Announces Shanchun Huang as New CEO" (the "CEO Announcement Press Release"). The CEO Announcement Press Release stated, *inter alia*, that "***Mr. Huang brings the right mix of talent, experience and success to lead the Company's next stage of growth***."[1]

11. Moreover, on April 15, 2021, Future FinTech filed a Form 10-K with the SEC, to report its financial and operational results for the year ending December 31, 2020 (the "2020 10-K). Regarding the Company's internal controls over financial reporting, the 2020 10-K stated, *inter alia*, that "***we are obligated to maintain effective internal controls over financial reporting. Our internal controls may be determined not to be effective, which may adversely affect investor confidence in us and, as a result, decrease the value of our Common Stock.***"

12. The truth emerged on January 11, 2024, when the SEC published a press release on its website entitled, "SEC Charges Future FinTech CEO Shanchun Huang with Fraud and Disclosure Failures" (the "SEC Press Release"). Attached to the SEC Press Release was the complaint filed by the SEC against Defendant Huang in the United States District Court for the Southern District of New York, captioned *Securities and Exchange Commission v. Huang*, Case No. 1:24-cv-00238-DLC (the "SEC Action"). The SEC Action alleges, *inter alia*, that Defendant Huang, "***manipulated the stock price of Future FinTech by buying hundreds of thousands of***

---

[1] Unless otherwise stated, all emphasis herein is added.

***Future FinTech shares to artificially increase the company's stock price shortly before and after he became CEO in March 2020.***"

13. On this news, the price per share of the Company's stock fell $0.27, or approximately 20.9%, from a closing price of $1.29 per share on January 11, 2024, to close at $1.02 per share on January 12, 2024.

14. Throughout the Relevant Period, in breach of their fiduciary duties owed to Future FinTech, the Individual Defendants willfully or recklessly caused the Company to make materially false and/or misleading statements that failed to disclose, *inter alia*, that: (1) Defendant Huang engaged in manipulative trading of Future FinTech's stock to artificially inflate its price and prevent it from being delisted from Nasdaq; (2) the true nature of Defendant Huang's ownership of Future FinTech stock in the Company's SEC filings was misrepresented; (3) the Company's legal risk as it pertained to Defendant Huang's trading of Company stock was understated; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the SEC opened an investigation into Defendant Huang and the Company. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

15. The Individual Defendants failed to correct and/or caused the Company to fail to correct these false and misleading statements and omissions of material fact, rendering them personally liable to the Company for breaching their fiduciary duties.

16. Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls.

17. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

18. In light of the Individual Defendants' misconduct—which has subjected the Company, its former CEO and two of its former Chief Financial Officers ("CFOs") to a federal securities fraud class action lawsuit pending in the United States District Court for the District of New Jersey (the "Securities Class Action"), which recently survived a motion to dismiss, and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

19. Before initiating this action, consistent with Florida law, Plaintiff served a pre-suit demand on the Company's Board of Directors (the "Board"), dated July 29, 2026, to investigate, remediate and prosecute the claims alleged herein (the "Litigation Demand"). The Litigation Demand was delivered on August 11, 2026. Plaintiff's Litigation Demand set forth a credible case that certain of Future FinTech's current and former officers and directors had breached their fiduciary duties to the Company.

20. Instead of acting in good faith to investigate these serious allegations, the Board took no action and simply ignored the Litigation Demand. After waiting over the 90-days that Florida law requires, Plaintiff now brings this action on behalf of Future FinTech against the Individual Defendants for breach of fiduciary duty and contribution under Sections 10(b) and 21D of the Exchange Act as well as other state law claims.

## JURISDICTION AND VENUE

21. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 21D of the Exchange Act (15

U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

22. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

23. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

24. Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

25. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, the Defendants have conducted business in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

## PARTIES

### Plaintiff

26. Plaintiff is a current shareholder of Future FinTech. Plaintiff has continuously held Future FinTech common stock at all relevant times.

27. Plaintiff is a resident of California.

### Nominal Defendant Future FinTech

28. Future FinTech is a Florida corporation with principal executive offices at 02B-03A, 23/F, Sino Plaza, 255-257 Gloucester Road, Causeway Bay, Hong Kong. Future FinTech common stock trades on the Nasdaq Stock Market under the symbol "FTFT."

### Defendant Huang

29. Defendant Huang served as the Company's CEO and as a Company director from March 4, 2020, until August 5, 2024.

30. The Schedule 14A the Company filed with the SEC on October 13, 2023 (the "2023 Proxy Statement") stated the following about Defendant Huang:

> Mr. Shanchun Huang has served as the Chief Executive Officer of the Company and a member of the Board since March 4, 2020. Since April 2021, Mr. Huang has served as the Chairman of the Board of Directors of Mars Acquisition Corp., a Cayman Islands exempted company incorporated as a blank check company (Nasdaq:MARX). Mr. Huang served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management service, from March 2011 to March 2020, and as the president of Wealth Index (Beijing) International Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020. From May 2001 to June 2004, Mr. Huang was the vice president of Zhejiang Geely Holding Group Corporation, a global automobile company headquartered in Hangzhou, China. Mr. Huang graduated from Hefei Staff University of Science and Technology in July 1986, majoring in news collection and editing. The Board believes that Mr. Huang's significant experience in investment and management will be an asset to the Company and the Board.

31. Upon information and belief, Defendant Huang is a citizen of the United Kingdom.

**<u>Defendant Chen</u>**

32. Defendant Chen served as the Company's CFO from May 21, 2019 until November 30, 2020. Previously, Defendant Chen also served as the Company's Vice President from November 30, 2020 to April 2023.

33. The Schedule 14A the Company filed with the SEC on October 13, 2020 (the "2020 Proxy Statement") states the following about Defendant Chen:

> Ms. Chen, age 54, served as the CFO of AnZhiXinCheng (Beijing) Technology Co., Ltd. from August 2018 to May 2019. Ms. Chen served as Independent Director of Hello iPayNow (Beijing) Company Ltd. from April 2019 to September 2020. From August 2017 to July 2018, Ms. Chen served as CFO of Beijing Logis Technology Development Co., Ltd., a company listed on The National Equities Exchange and Quotations Co., Ltd. of China which is a Chinese over-the-counter stock trading system. From June 2016 to July 2017, Ms. Chen served as Group Chief Financial Officer of Beijing AnWuYou Food Co., Ltd. Ms. Chen served as Chief Financial Officer Beijing DKI Investment Management Co., Ltd. from

> August 2012 to May 2016. Ms. Chen received a degree of Doctor of Business Administration from Victoria University, Neuchatel, Switzerland in March 2008 and an MBA degree from City University of Seattle, Washington, U.S. in April, 2000. Ms. Chen holds Fellow Membership of CPA Australia (FCPA), Fellow Membership of the Association of International Accountants U.K. (FAIA). Ms. Chen is a Member of the Chartered Institute of Management Accountants (CIMA), a Senior Member of the International Financial Management (SIFM) accredited by the Ministry of Human Resources and Social Security of PRC and a Certified Internal Control Professional, as granted by Internal Control Institute (ICI). In connection with her appointment as CFO, the Company entered into an employment agreement (the "Agreement") with Ms. Chen on May 21, 2019 which was renewed on May 21, 2020.

34. Upon information and belief, Defendant Chen is a citizen of China.

**Defendant Yi**

35. Defendant Yi served as the Company's CFO from November 30, 2020 until June 25, 2025.

36. The Schedule 14A the Company filed with the SEC on October 11, 2024 (the "2024 Proxy Statement") states the following about Defendant Yi:

> Mr. Yi served as an independent director of Freight Technologies, Inc. (Nasdaq: FRGT and formerly known as Hudson Capital Inc.) from March 31, 2020 to February 14, 2022. Mr. Yi was the Chief Financial Officer of SSLJ.com Limited from July 2018 to July 2019. From June 2011 to August 2018, Mr. Yi was the Chief Financial Officer and a board member of Wave Sync Corp. (formerly known as China Bio-Energy Corp). From September 2009 to April 2011, he served as a senior manager at Qi He Certified Public Accountants Co. Ltd. Form July 2007 to August 2010, Mr. Yi was a senior auditor at Ernst & Young. Mr. Yi received his Bachelor of Science degree in Accounting from School of Business Administrations of Liaoning University in 2004 and his Master of Science degree in Accounting and Finance from Victory University, Australia in 2006. Mr. Yi is a Certified Public Accountant in Australia.

37. Upon information and belief, Defendant Yi is a citizen of China.

**Defendant F. Li**

38. Defendant F. Li served as a Company director from May 8, 2015, until resigning on June 20, 2025. Defendant F. Li also served as Chairman of the Board from June 23, 2021 until June 20, 2025.

39. The 2024 Proxy Statement stated the following about Defendant F. Li:

> Mr. Fuyou Li has served as a member of the Board and a member of the audit and compensation committees of the Board since May 8, 2015. Mr. Li was appointed as the Chairman of the Board on June 23, 2021. Mr. Li graduated from Xi'an Jiaotong University with a doctor's degree in economics. He has taught international finance as a professor at Xi'an Jiaotong University from 2000 to July 2023. The Board believes his qualifications, professional background and expertise in international finance are important to the Company and the Board.

40. Upon information and belief, Defendant F. Li is a citizen of China.

**Defendant Y. Li**

41. Defendant Y. Li served as a Company director from June 23, 2021 until June 20, 2025. She also served as the Company's Vice President from June 2021 until June 20, 2025.

42. The 2024 Proxy Statement stated the following about Y. Li:

> Ms. Ying Li was appointed as a member of the Board on June 23, 2021 and she has served as a director of Alpha International Securities (HONG KONG) Limited since September 9, 2020 and as a director of Alpha International Financial Holdings Limited since February 5, 2020. The Company acquired FTFT International Securities and Futures Limited in November 2023 and changed its name to FTFT International Securities and Futures Limited. Ms. Li has served as the vice president of the Company and a director of Future FinTech (Hong Kong) Limited, a wholly owned subsidiary of the Company since July 2016. From October 2011 to December 2019, Ms. Li served as the secretary of the Board of the Company. Ms. Li received her bachelor's degree in English from Xi'an International Studies University in July 2010. The Board believes that Ms. Li's extensive business and operational knowledge of the Company qualifies her as a member of the Board.

43. Upon information and belief, Defendant Y. Li is a citizen of China.

**Defendant Lau**

44. Defendant Lau served as a Company director from December 23, 2014 until September 30, 2024.

45. The 2023 Proxy Statement stated the following about Defendant Lau:

> Mr. Lau is the Chief Financial Officer of Beauty Express Group Holdings Limited ("Beauty Express"), a private company in Hong Kong since April 2021. Mr. Lau is a Certified Public Accountant of the Hong Kong Institute of Certified Public Accountants and CPA Australia. Mr. Lau has over 20 years of experience in the

> accounting profession. Mr. Lau started his career in Deloitte in Hong Kong and Beijing from 1997 to 2004. Prior to joining Beauty Express in 2021, Mr. Lau worked in various public and private companies in the United States, England and Hong Kong as Director of Finance and CFO for over fifteen years. Mr. Lau was the chief financial officer and was subsequently an executive director of Haike Chemical Group Limited, a company listed on the London Stock Exchange (LSE code: HAIK), from December 2006 to March 2009. Mr. Lau subsequently resigned as chief financial officer and was redesignated as a non-executive director of Haike Chemical Group Limited in March 2009 and retired as a non-executive director in January 2010. From April 2009, Mr. Lau was employed by Auto China International Limited, a company listed on the NASDAQ Capital Market and subsequently quoted on the OTC Markets (OTC: AUTCF) as chief financial officer. He was redesignated as the director of finance in July 2009 and subsequently departed in June 2013. From June 2010 to January 2013, Mr. Lau was an independent director of Lizhan Environmental Corporation. Mr. Lau was the chief financial officer of Troops, Inc. (NASDAQ: TROO, formerly known as SGOCO Group Ltd.) from July 2013 to June 2015. Mr. Lau was the chief financial officer of China Golden Classic Group Limited (HKEX: 8281.HK) from July 2015 to July 2018. Mr. Lau was the chief financial officer of Dafy Holdings Limited (HKEX: 1826.HK) from August 2018 to October 2019. Mr. Lau was the chief financial officer of a Hong Kong incorporated private company from November 2019 to February 2021. He was an independent non-executive director of Winshine Science Company Limited (HKEX: 209.HK) from October 2017 to April 2019. Mr. Lau holds a bachelor's degree in commerce from Monash University, Australia. The Board believes that Mr. Lau's extensive knowledge and experience in accounting and his public company experience is important to the Company's internal controls and financial reporting and its status as a US publicly traded company.

46. Under information and belief, Defendant Lau is a citizen of Hong Kong.

**<u>Defendant Zhao</u>**

47. Defendant Zhao has served as a Company director since July 15, 2020. Defendant Zhao also currently serves as the Chairman of the Compensation Committee and as a member of the Audit Committee.

48. The Schedule 14A the Company filed with the SEC on October 19, 2026 (the "2026 Proxy Statement") stated the following about Defendant Zhao:

> Mr. Mingjie Zhao was appointed as a member of the Board and Chairman of the Compensation Committee and a member of Audit Committee of the Board on July 15, 2020. Mr. Zhao has served as a director of New York Hua Yang, Inc. since April 2018. From July 2016 to March 2018, Mr. Zhao served as Chief Executive Officer of TD Holdings, Inc. Mr. Zhao was the Chief Operating Officer and a

> director of New York Hua Yang, Inc. from September 2011 to July 2016. Mr. Zhao obtained his Master of Business Administration degree from University of Bridgeport in Connecticut in May 2003 and his Bachelor of Science degree from China Eastern Normal University in Shanghai, China in July 1985. The Board believes that Mr. Zhao's experience and extensive knowledge of management and public company is essential to the Company.

49. Under information and belief, Defendant Zhao is a citizen of New York.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

50. By reason of their positions as officers, directors, and/or fiduciaries of Future FinTech and because of their ability to control the business and corporate affairs of Future FinTech, the Individual Defendants owed Future FinTech and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Future FinTech in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Future FinTech and its shareholders so as to benefit all shareholders equally.

51. Each director and officer of the Company owes to Future FinTech and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

52. The Individual Defendants, because of their positions of control and authority as directors and/or officers of Future FinTech, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

53. To discharge their duties, the officers and directors of Future FinTech were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

54. Each Individual Defendant, by virtue of his or her position as a director and/or

officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Future FinTech, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Future FinTech's Board at all relevant times.

55. As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on Nasdaq, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

56. To discharge their duties, the officers and directors of Future FinTech were required to exercise reasonable and prudent supervision over the management, policies, practices, and

internal controls of the Company. By virtue of such duties, the officers and directors of Future FinTech were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Florida and the United States, and pursuant to Future FinTech's own Code of Business Conduct and Ethics (the "Code of Conduct");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Future FinTech conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Future FinTech and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Future FinTech's operations would comply with all applicable laws and Future FinTech's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

57. Each of the Individual Defendants further owed to Future FinTech and the shareholders the duty of loyalty requiring that each favor Future FinTech's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

58. At all times relevant hereto, the Individual Defendants were the agents of each other and of Future FinTech and were at all times acting within the course and scope of such agency.

59. Because of their advisory, executive, managerial, directorial, and controlling positions with Future FinTech, each of the Individual Defendants had access to adverse, non-public information about the Company.

60. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Future FinTech.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

61. In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

62. The purpose and effect of the conspiracy, common enterprise, and/or common

course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

63. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of Future Fintech was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

64. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

65. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Future Fintech and was at all times acting within the course and scope of such agency.

## FUTURE FINTECH'S CODE OF CONDUCT

66. Future FinTech's Code Conduct applies to "[a]ll officers, key staff members, and members of the Board of Future FinTech" and requires that they "exercise the highest ethical standards of conduct and practice fundamental honesty at all times."

67. The Code of Conduct notes its purposes as follows:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;
- Full, fair, accurate, timely and understandable disclosure in the reports and documents the Company files with, or submits to, the Securities and Exchange Commission, as well as in other public communications made by or on behalf of the Company;
- Compliance with applicable governmental laws, rules and regulations;
- Prompt reporting to the appropriate person of violations of laws, rules, regulations, this Code and other Company policies; and
- Accountability for adherence to this Code.

68. In the section titled "Personal and Professional Integrity," the Code of Conduct states the following:

- Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or in the Company's interests.
- Observe all applicable governmental laws, rules and regulations.
- Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in the maintenance of a high standard of accuracy and completeness in the Company's financial records and other business-related information and data.

* * *

- Comply with policies and procedures established by the Company, including policy manuals, procedure manuals, safety manuals and employee handbooks.

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices.

* * *

- Refrain from taking advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

- Protect the assets of the Company and ensure their proper use.

69. In violation of the Code of Conduct, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Also, in violation of the Code of Conduct, the Individual Defendants failed to maintain the accuracy of Future FinTech's records and reports, maintain internal controls, comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

## AUDIT COMMITTEE CHARTER

70. The Company also maintains an Audit Committee Charter (the "Audit Committee Charter"). The Audit Committee Charter states that the purpose of the Audit Committee is to "oversee the accounting and financial reporting processes of Future FinTech." The Audit Committee Charter outlines the following duties and responsibilities of the Audit Committee:

- assisting the Board of Directors in fulfilling its responsibilities by reviewing: (i) the financial reports provided by the Company to the Securities and Exchange Commission ("SEC"), the Company's stockholders or to the general public, and (ii) the Company's internal financial and accounting controls;

- recommending, establishing and monitoring procedures designed to improve the quality and reliability of the disclosure of the Company's

financial condition and results of operations;

- overseeing the appointment, compensation, and evaluation of the qualifications and independence of the Company's independent auditors;
- overseeing the Company's compliance with legal and regulatory requirements;
- overseeing the adequacy of the Company's internal controls and procedures to promote compliance with accounting standards and applicable laws and regulations;

71. The Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by engaging in or permitting the Company to engage in issuing materially false and misleading statements to the investing public and facilitating and disguising the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In addition, the Individual Defendants who served on the Company's Audit Committee during the Relevant Period violated the Audit Committee Charter by failing to adequately oversee the integrity of the Company's financial disclosures, failing to adequately oversee the Company's compliance with legal and regulatory requirements, failing to adequately oversee the Company's risk assessments and risk management, failing to adequately discuss with management the Company's financial information prior to public distribution, and failing to adequately oversee the Company's disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background on Future FinTech

72. The Company was originally incorporated under the name Cyber Public Relations, Inc. in 1998. In 2008, the Company became an indirect holding company for SkyPeople Juice Group Co. Ltd., and changed its name to SkyPeople Fruit Juice, Inc. In accordance with this change in corporate structure, the Company became engaged in the production and sale of fruit juice

concentrates. However, the Company faced pressure from rising costs and, *inter alia*, changes in environmental laws in China which led it to shift its operations away from the production of fruit juice concentrates. As such, the Company pivoted towards the distribution of financial technology-related services.

73. Following this operational shift, the Company changed its name again to Future FinTech to reflect its focus on e-commerce and blockchain technology. The Company's primary operations have included: (1) supply chain financing services and trading in China; (2) asset management in Hong Kong; (3) cross-border money transfer services in the UK; and (4) cryptocurrency mining operations in the United States. Notably, as of November 2024, the Company is no longer engaged in asset management services in Hong Kong.

**Nasdaq's Listing Requirements**

74. In order for a Company to be listed on Nasdaq, it must first meet certain listing requirements. Specifically, according to Nasdaq Rule 5550, "[a] Company that has its Primary Equity Security listed on the Capital Market must continue to meet all of the requirements set forth in Rule 5550(a)[.]" Nasdaq Rule 5550(a)(2) states that, to continue one's listing, the "[m]inimum bid price [must be] at least $1 per share[.]"

75. Nasdaq provides the following information on its website concerning delisting, in relevant part:

> Delisting is the process where a company's stock is removed from a stock exchange, making it no longer available for public trading.
>
> ***This transition is crucial as it impacts how the stock is traded and can significantly alter a company's financial strategy and investor relations.***
>
> ***Stock exchanges set financial thresholds that companies must maintain, such as minimum share price and market capitalization.***

* * *

> ***Falling short of these benchmarks can trigger delisting, signaling potential trouble within the company and possibly leading to decreased investor confidence and a decline in stock value.***
>
> * * *
>
> ***[Involuntary] delisting is often perceived negatively, indicating serious issues within the company, and can lead to significant market uncertainty and a loss of investor confidence.***
>
> ***For investors, involuntary delisting is a red flag, signaling potential risks and the need for cautious evaluation. It often necessitates a thorough reassessment of the investment's viability and the company's future prospects.***
>
> * * *
>
> **Impact of Delisting on Investors**
>
> * * *
>
> The initial reaction to delisting can significantly affect investor sentiment, often leading to a sharp sell-off.
>
> ***The urgency to liquidate positions, especially in cases of involuntary delisting, can result in substantial financial losses for shareholders.***
>
> * * *
>
> ***Delisting is a significant event in the life cycle of a publicly traded company and has far-reaching implications for investors.***

**<u>Leading up to the Relevant Period, Future FinTech's Stock Price Dropped Out of Compliance with Nasdaq, Leading to Potential Delisting</u>**

76. Around August 2019, Future FinTech's stock price dropped below the Nasdaq listing requirement of $1.00 per share. In the months following, the stock maintained a downward trend, dropping to approximately $0.65 in early November of 2019.

77. On November 4, 2019, Nasdaq provided Future FinTech with notice that the Company was out of compliance with the minimum bid price requirement established by Nasdaq Rule 5550(a)(2), explaining that Future FinTech's closing bid price for its stock had fallen below $1.00 per share for 30 consecutive trading days. According to the letter from Nasdaq, Future

FinTech had 180 days to meet Nasdaq's minimum bid price requirement or face potential delisting.

78. Future Fintech filed a Form 8-K with the SEC on November 8, 2019 notifying the public of Nasdaq's letter. Within the Form 8-K, the Company assured the public that "[t]he Company intends to continue actively monitoring the bid price for its common stock between now and the expiration of the Compliance Period [May 4, 2020] and will consider all available options to resolve the deficiency and regain compliance with the Minimum Bid Price Requirement." Subsequently, on December 27, 2019, Future FinTech's stock fell again to $0.435 per share.

**<u>Defendant Haung's Manipulative Trading of Company Stock</u>**

***Defendant Huang's Securities Account Transactions Prior to Becoming CEO***

79. In December of 2017, Defendant Huang opened a securities account linked to a savings account through a financial institution in Hong Kong. Defendant Huang was the only account holder on both accounts and the only person with authority over the accounts.

80. While Defendant Huang was being investigated for stock manipulation, he gave sworn testimony to the SEC on April 26, 2021, in which he stated that he was approached in late 2019 or early 2020 by Xue to become CEO of Future FinTech.

81. Shortly thereafter, on January 13, 2020, Defendant Huang began trading stock of Future FinTech. Defendant Huang did not previously own stock in Future FinTech and had not executed trades from his account for at least four months prior. Prior to becoming CEO of the Company, Defendant Huang purchased 500,379 shares of Company stock, with no sales having been made.

***The Manipulative Nature of Defendant Huang's Transactions***

82. Defendant Huang's transactions of Company stock shortly prior to and following his appointment as CEO of Future Fintech constituted a scheme to artificially inflate the

Company's stock price. Defendant Huang repeatedly traded high volumes of Company stock on specific days, representing substantial percentages of the Company's total trading volume on such dates. For instance, according to the SEC Action, from January 13, 2020 to April 9, 2020, there were seven days during which Defendant Huang's trading constituted 26% or more of the daily reported trading volume of the Company's stock.

83. Defendant Huang's trading of Company stock reflects the placing of multiple buy orders in a short timeframe and/or the placing of limit buy orders with escalating limit prices from one order to the next. Notably, Defendant Huang often purchased Company stock at the top of the National Best Bid and Offer ("NBBO") spread.[2] Trades of this nature generally do not make economic sense for investors, given that they seek to acquire the stock at the lowest available price. In contrast, other investors typically purchase Future FinTech shares in the middle of the NBBO spread.

84. During the period in which Defendant Huang began acquiring Future FinTech stock, the Company's price per share rose considerably. At the close of trading on January 13, 2020, the date on which Defendant Huang first purchased Company stock, Future FinTech's price per share was $0.65. However, by the close of trading on February 21, 2020, the Company stock price had risen above $1.00 for the first time.

85. The majority of Defendants Huang's Future FinTech stock purchases were within the price range of $0.90 to $0.98 per share. In addition, Defendant Huang frequently executed multiple buy orders in a condensed timeframe, which pushed stock prices higher.

***Defendant Huang's Transactions for January 27, 2020***

[2] The NBBO refers to the best bid (the highest price any buyer is willing to offer to buy the stock) and the best offer (the lowest price any seller is willing to accept for the stock). *See* 17 C.F.R. § 242.600(b)(15).

86. On January 27, 2020, Defendant Huang's trading of Future FinTech stock constituted 42% of the Company's reported daily trading volume. At Nasdaq's market open, Future Fintech was worth $0.79 per share, and closed at $0.84 per share.

87. Defendant Huang's trades for January 27, 2020 consisted of thirteen block purchase orders, varying in size from 2,000 to 20,000 shares, totaling 91,000 shares within a 23-minute span of time.

88. The price and size of the transactions are as follows:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE |
|---|---|---|---|
| 1/27/2020 | 11:56 am | 2,000 | $0.81 |
| 1/27/2020 | 11:57 am | 3,000 | $0.82 |
| 1/27/2020 | 11:58 am | 5,000 | $0.82 |
| 1/27/2020 | 11:59 am | 2,000 | $0.84 |
| 1/27/2020 | 12:01 pm | 5,000 | $0.84 |
| 1/27/2020 | 12:01 pm | 10,000 | $0.84 |
| 1/27/2020 | 12:04 pm | 10,000 | $0.88 |
| 1/27/2020 | 12:05 pm | 10,000 | $0.88 |
| 1/27/2020 | 12:08 pm | 2,000 | $0.90 |
| 1/27/2020 | 12:10 pm | 20,000 | $0.88 |
| 1/27/2020 | 12:13 pm | 2,000 | $0.90 |
| 1/27/2020 | 12:16 pm | 10,000 | $0.90 |
| 1/27/2020 | 12:19 pm | 10,000 | $0.90 |

***Defendant Huang's Transactions for January 28, 2020***

89. On January 28, 2020, Defendant Huang's trading of Future FinTech stock constituted 43% of the Company's reported daily trading volume. At Nasdaq's market open, Future FinTech was worth $0.86 per share when the Nasdaq market opened, and closed at $0.85 per share.

90. Defendant Huang began trading Future FinTech stock shortly after 10:30 am, placing a buy order for 2,000 shares with a limit price of $0.87, which was at the top of the NBBO. In the span of less than an hour, Huang placed eight Future FinTech buy orders near the top or

above the NBBO spread totaling 31,000 shares. Defendant Huang's transactions consisted of five orders of 5,000 shares and three orders of 2,000 shares. Notably, according to the SEC Action, Defendants Huang's last purchase order was executed at 11:46 am and his trading volume exceeded the volume of all other traders at that point.

91. The price, size and the spread of the transactions are as follows:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE | BID | ASK |
|---|---|---|---|---|---|
| 1/28/2020 | 10:32 am | 2,000 | $0.87 | $0.8501 | $0.8700 |
| 1/28/2020 | 10:45 am | 5,000 | $0.89 | $0.8500 | $0.8597 |
| 1/28/2020 | 10:53 am | 5,000 | $0.89 | $0.8585 | $0.8597 |
| 1/28/2020 | 11:05 am | 5,000 | $0.86 | $0.8502 | $0.8596 |
| 1/28/2020 | 11:06 am | 5,000 | $0.87 | $0.8502 | $0.8700 |
| 1/28/2020 | 11:08 am | 5,000 | $0.87 | $0.8502 | $0.8700 |
| 1/28/2020 | 11:10 am | 2,000 | $0.88 | $0.8701 | $0.8800 |
| 1/28/2020 | 11:28 am | 2,000 | $0.88 | $0.8701 | $0.8799 |

***Defendant Huang's Transactions on February 4, 2020***

92. On February 4, 2020, Defendant Huang's trading of Future FinTech stock constituted 34% of the daily trading volume of the Company. At Nasdaq's market open, Future FinTech was worth $0.87 per share, and closed at $0.97 per share.

93. According to the SEC Action, on February 4, 2020, beginning at 2:46 pm, when the Future FinTech stock price was $0.8489 and the NBBO spread was $0.83-$0.849, several sequential orders and trades were made in Defendant Huang's securities account. Starting with a 5,000-share order at a limit price of $0.85 per share, a series of 16 limit buy orders were executed in just over 30 minutes. As a result of Defendant Huang's manipulative trading, the market price of Future FinTech initially rose to $0.98 and the NBBO spread rose to $0.9215-$0.98.

94. Notably, the Company's price per share subsequently dropped to $0.9215 and in that time three additional limit orders by Defendant Huang's account with limits near or about the

prevailing NBBO spread, as illustrated from 3:17 pm to 3:25 pm in the chart provided in.

95. According to the SEC Action, Defendant Huang's securities account completed its orders for the day with one final purchase order one minute before market close, near the top of the NBBO spread. This purchase was for 2,000 shares at a price of $0.9621.

96. The limit buy orders placed on February 4, 2020 are as follows:

| DATE | TIME | ORDER QUANTITY | LIMIT BUY PRICE | BID | ASK |
|---|---|---|---|---|---|
| 2/4/2020 | 9:30 am | 500 | N/A | $0.8650 | $1.0000 |
| 2/4/2020 | 9:30 am | 500 | N/A | $0.8650 | $1.0000 |
| 2/4/2020 | 2:46 pm | 5,000 | $0.85 | $0.8300 | $0.8489 |
| 2/4/2020 | 2:47 pm | 5,000 | $0.85 | $0.8400 | $0.8488 |
| 2/4/2020 | 2:48 pm | 5,000 | $0.87 | $0.8500 | $0.8600 |
| 2/4/2020 | 2:50 pm | 3,000 | $0.88 | $0.8700 | $0.8800 |
| 2/4/2020 | 2:52 pm | 2,000 | $0.90 | $0.8800 | $0.9000 |
| 2/4/2020 | 3:05 pm | 3,000 | $0.90 | $0.8700 | $0.8849 |
| 2/4/2020 | 3:06 pm | 1,800 | $0.90 | $0.8700 | $0.8849 |
| 2/4/2020 | 3:07 pm | 3,000 | $0.90 | $0.8700 | $0.8900 |
| 2/4/2020 | 3:09 pm | 3,000 | $0.89 | $0.8701 | $0.8800 |
| 2/4/2020 | 3:10 pm | 3,000 | $0.90 | $0.8901 | $0.9000 |
| 2/4/2020 | 3:11 pm | 5,000 | $0.91 | $0.8900 | $0.8907 |
| 2/4/2020 | 3:11 pm | 3,000 | $0.92 | $0.9100 | $0.9194 |
| 2/4/2020 | 3:13 pm | 3,000 | $0.94 | $0.9201 | $0.9300 |
| 2/4/2020 | 3:14 pm | 1,000 | $0.95 | $0.9400 | $0.9470 |
| 2/4/2020 | 3:14 pm | 2,000 | $0.95 | $0.9400 | $0.9500 |
| 2/4/2020 | 3:15 pm | 2,000 | $0.98 | $0.9500 | $0.9699 |
| 2/4/2020 | 3:16 pm | 3,000 | $0.98 | $0.9200 | $0.9700 |
| 2/4/2020 | 3:17 pm | 1,000 | $0.99 | $0.9200 | $0.9800 |
| 2/4/2020 | 3:18 pm | 2,000 | $0.97 | $0.9600 | $0.9900 |
| 2/4/2020 | 3:25 pm | 2,000 | $0.98 | $0.9600 | $0.9673 |
| 2/4/2020 | 3:59 pm | 2,000 | MKT | $0.9300 | $0.9600 |

***Defendant Huang's transactions on February 6, 2020***

97. On February 6, 2020, Defendant Huang purchased 103,000 shares of Future

FinTech stock which constituted 60% of Future FinTech's reported daily trading volume. Future FinTech's stock opened at $0.89 per share, and closed at $0.91.

98. According to the SEC Action, Defendant Huang began purchasing Future FinTech stock at 9:57 am. Within nine minutes of Defendant Huang's trading activities, the price of Future Fintech stock rose to $1.05 per share.

99. Once again, the Company's stock price subsequently dropped to $0.91. Defendant Huang followed this drop with a series of five buy orders during the last five minutes of trading. The last transaction was executed at $0.98 per share.

***Defendant Huang's Transactions from March 2020 through June 2020***

100. On March 23, 2020, Defendant Huang proceeded to sell shares of Future FinTech for the first time. Defendant Huang sold 10,000 shares of stock for $1.01 per share for proceeds totaling $9,946.77. That same day, Defendant Huang provided a loan to Future FinTech of $30,000, the first of several he would make to the Company.

101. On March 27, 2020, Defendant Huang sold 21,500 Future FinTech shares at a price of $0.99 per share for total proceeds of $20,959.03.

102. On April 1, 2020, Defendant Huang purchased 10,200 Future FinTech shares with an average price of $1.09 per share.

103. On April 8, 2020, Defendant Huang purchased 19,500 shares of Future FinTech with an average price of $1.22 per share.

104. On April 9, 2020, Defendant Huang purchased 8,500 shares of Future FinTech at an average price of $1.20 per share. The settlement date for the transactions on April 9, 2020 was April 14, 2020. Notably, the Company's stock price at the start of trading on April 9, 2020 was $1.17, and closed at $1.20.

105. As such, from January 13, 2020 through April 9, 2020, Defendant Huang purchased over 570,000 Future FinTech shares at a cost of more than $520,000, of which he placed buy orders on two-thirds of the trading days in that period.

106. Defendant Huang also provided loans across ten transactions between March 23, 2020 and June 19, 2020, totaling $289,000, which provided Future FinTech the ability to cover operating expenses, as extrapolated from bank documents obtained by the SEC. These loans were funded by the proceeds of Future FinTech stock sales as evidenced in bank records obtained by the SEC. According to the SEC Action, the proceeds from Future FinTech stock sales comprised $259,000 of the $298,000 of Defendant Huang's loans to Future FinTech.

**Future Fintech Re-establishes Nasdaq Compliance as Defendant Huang Continues to Make Manipulative Trades of Company Stock**

***April 16, 2020 Press Release and Form 8-K***

107. On April 16, 2020, the Company filed a Form 8-K with the SEC. The Company announced through an accompanying press release that it was back in compliance with Nasdaq Rule 5550(a)(2), because Future FinTech's stock price had closed above $1.00 per share for ten consecutive days.

***Defendant Huang's Continued Manipulative Trading of Company Stock***

108. According to the SEC Action, from April 16, 2020 to January 4, 2021, Defendant Huang purchased 97,000 additional shares of Future FinTech while selling more than 534,000 shares through his offshore securities account.

***HSBC closes Defendant Huang's Securities Account***

109. The final transaction of Future FinTech stock conducted voluntarily by Defendant Huang was placed on January 4, 2021, and the account was frozen after the order was placed.

110. According to the SEC Action, HSBC, the financial institution providing Defendant

Huang's securities account, conducted an internal review of what it determined to be suspicious activity pertaining to the account. Following this review, HSBC issued a letter on February 8, 2021 to Defendant Huang. In the letter, HSBC informed Defendant Huang it would no longer be able to provide him with banking services. HSBC stated it came to this decision after "comprehensive review" and because it was "committed to the highest standards in its controls against financial crimes."

111. On March 3, 2021, Defendant Huang's 107,497 shares of Future FinTech were liquidated at a price of $5.82 per share for total proceeds of approximately $625,436. Defendant Huang's account was closed March 10, 2021.

**<u>Defendant Huang had Knowledge and Control Over His Offshore Securities Account, but Failed to Disclose His Ownership and Purchases of Future FinTech Stock</u>**

***Defendant Huang's Knowledge and Control Over His Offshore Securities Account***

112. Throughout the time his account was open, Defendant Huang was its sole holder. Defendant Huang received proceeds from the securities account through direct sales of Future FinTech stock sales, which were then used for both Defendant Huang's personal expenses and to provide $259,000 of the $289,000 he loaned to the Company.

113. The SEC Action notes that audio recordings of telephone conversations between HSBC and Defendant Huang pertaining to banking and trading related issues demonstrate that Defendant Huang was in control of the securities account. For example, Defendant Huang called from Dubai, United Arab Emirates ("UAE"), to complain about his inability to perform trades for 20 days. During the call, Defendant Huang provided the bank representative with two telephone numbers, one from a UAE number and a United Kingdom ("UK") number. Defendant Huang later admitted in testimony before the SEC on April 26, 2021 that the UK number noted above was his cell phone number.

114. Moreover, Defendant Huang made a call from London, UK, in which he identified himself as the caller. Also during this call, Defendant Huang complained about his inability to buy or sell U.S. stocks with his account. Notably, Defendant Huang provided a credit card number during the call which matched one of his credit card accounts.

115. Similarly, the location details of Defendant Huang's credit card account indicate that he was in control of the securities account discussed above. From the beginning of January 2020 to late January 2020, Defendant Huang resided in China, where his credit card charges and IP addresses also corresponded to. From February 2020 through August 2020, Defendant Huang resided in Dubai, UAE, which is also where his credit card charges and IP addresses corresponded during that same period. From September 2020 through March 2021, when Defendant Huang's securities account was liquidated, Defendant Huang resided in London, UK. During that period of time, Defendant Huang's credit card charges and IP addresses corresponded to London.

***Defendant Huang Failed to Disclose His Ownership and Purchases of Future FinTech Stock***

116. As per Section 12 of the Exchange Act, Defendant Huang had a duty to file with the SEC, within ten days after becoming an officer or a director, a statement disclosing the amount of stock in that company that the officer or director beneficially owns. *See* 15 U.S.C § 78p(a).

117. Additionally, subsequent statements must be filed if there is a change in stock ownership. *See* 15 U.S.C. § 78p(a)(2)(C). Moreover, the officer or director must indicate their ownership at the date of filing and any changes in ownership since the most recent filing. *See* 15 U.S.C. § 78p(a)(3)(B).

118. According to Rule 16a-3 under the Exchange Act [17 C.F.R. § 240.16a- 3], initial statements of beneficial ownership must be filed on Form 3, statements of changes in beneficial ownership must be filed on Form 4, and annual statements of changes in beneficial ownership

must be filed on Form 5. *See* 56 Fed. Reg. 7242-01, 7267-68, Reporting Transactions and Holdings (Feb. 21, 1991).

119. After Defendant Huang became CEO on March 4, 2020, he did not file a Form 3 disclosing his ownership of Future FinTech stock with the SEC within ten days of becoming CEO. Moreover, according to the SEC Action, Defendant Huang owned 500,379 shares of Future FinTech stock on March 4, 2020.

120. Between March 4, 2020, and March 3, 2021, Defendant Huang purchased more than 165,000 Future FinTech shares and sold more than 680,500 Future FinTech shares in more than 250 transactions. Defendant Huang also failed to file any Form 4s or Form 5s with the SEC to disclose his numerous transactions of Company stock.

121. On March 12, 2021, the Company and Defendant Huang filed a Form 3 with the SEC (the "Huang Form 3"). Notably, the Huang Form 3 employed a reporting date of March 4, 2020, the date on which Defendant Huang became CEO of Future FinTech.

122. Within Item 2 of the Huang Form 3, which asks for the "Date of Event Requiring Statement", Defendant Huang answered "03/04/2020." The tables of securities owned were left blank on the form with the Explanation of Responses proclaiming, "[n]o securities are beneficially owned." Notably, no disclosure in Defendant Huang's Form 3 was made to indicate that he owned shares in Future FinTech from the time he became CEO on March 4, 2020 through March 3, 2021, when he was forced to liquidate his shares.

**False and Misleading Statements**

***March 10, 2020 Press Release and Form 8-K***

123. On March 10, 2020, the Company issued the CEO Announcement Press Release. The CEO Announcement Press Release stated the following, in relevant part:

Future FinTech Group Inc. (Nasdaq: FTFT; the "Company"), a company engages

in blockchain based e-commerce, ***announced that its board of directors appointed Mr. Shanchun Huang (also known as Shawn Shanchun Huang) as the Company's Chief Executive Officer and a director of the Board, effective March 4, 2020.*** Mr.Yongke Xue resigned as the Chief Executive Officer of the Company on March 4, 2020 but will remain as the Chairman of the Board of Directors of the Company (the "Board").

***Mr. Huang has over 16 years of experience in the financial service and investment industry***. He has provided financing solutions and advice for high growth companies in China and successfully assisted 37 enterprises to complete fundraising or public offerings in China. Most recently, ***Mr. Huang served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management service, from March 2011 to March 2020 and president of Wealth Index (Beijing) International Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020***. From May 2001 to June 2004, Mr. Huang was the vice president of Zhejiang Geely Holding Group Corporation, a global automobile company headquartered in Hangzhou, China. Mr. Huang graduated from Hefei Staff University of Science and Technology in July 1986 majoring in news collection and editing.

***Mr. Huang is also a prolific writer and has published four books in the finance and investment area in China***. These books include How to Raise Money to Start a Business, the Road to Red Chips, ***Comparison and Research Among Global Capital Markets, and The Practice of Small and Medium Enterprises Listed Overseas and Hong Kong***. Mr. Huang is the Knight Commander of Grace of the Order of Saint Lazarus of Jerusalem, and the first Grand Prior of the Grand Priory of China.

"We are very pleased that Mr. Huang will be joining the team as our Chief Executive Officer," said Yongke Xue, Chairman of the Board of the Company. "A key pillar of the Company's strategy is bringing onboard top leadership to accelerate our blockchain based e-commerce, digital asset technology and applications, and financial technology and service business. ***Mr. Huang brings the right mix of talent, experience and success to lead the Company's next stage of growth***."

"I'm thrilled to join Future FinTech's leadership team at a time when blockchain and traditional industry are intersecting to create breakthroughs," said Shanchun Huang. "I look forward to working with the team to execute on our transformational growth strategy."

124. Also on March 10, 2020, the Company filed a Form 8-K with the SEC (the "March 10, 2020 8-K"), signed by Defendant Huang. In connection with Defendant Huang's appointment as CEO, the March 10, 2020 8-K stated the following:

> On March 4, 2020, the Board appointed Mr. Shanchun Huang (also known as Shawn Shanchuan Huang) as the Company's Chief Executive Officer and a member of the Board to fill the vacancies created by the resignation of Mr. Xue and Mr. Yan.
>
> Mr. Huang, age 54, ***has served as the president of Wealth Index (Beijing) Fund Management Co., Ltd., which provides private equity fund management service, from March 2011 to March 2020, and as the president of Wealth Index (Beijing) International Investment Consulting Co., Ltd., which provides investment management and consulting services for non-securities related business, from August 2004 to March 2020.*** From May 2001 to June 2004, Mr. Huang was the vice president of Zhejiang Geely Holding Group Corporation, a global automobile company headquartered in Hangzhou, China. Mr. Huang graduated from Hefei Staff University of Science and Technology in July, 1986, majoring in news collection and editing. ***The Board believes that Mr. Huang's significant business experience will be an asset to the Company and the Board.***

125. The statements identified and referenced in ¶¶ 123-124 above were materially false and/or misleading because they emphasized Defendant Huang's "***mix of talent, experience, and success to lead the Company's next stage of growth***." However, at the time the statements were made, Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate the Company's stock price and prevent it from being delisted from Nasdaq. Moreover, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company to substantial legal and regulatory scrutiny.

***June 2, 2020 Form 10-K***

126. On June 2, 2020, the Company filed its Annual Report on Form 10-K with the SEC, to report its financial and operational results for the year ending December 31, 2019 (the "2019 10-K"). The 2019 10-K was signed by Defendants Huang, Chen, Lau, and F. Li, and attached certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Huang and Chen. The SOX certifications attested to the accuracy of the 2019 10-K, stating that the 2019 10-K "fully complies

with the requirements of Section 12(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in [the 2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

127. In addition, the SOX certifications attached to the 2019 10-K stated the following, in relevant part:

> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact*** necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> * * *
>
> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions): . . .
> **(b)** ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls over financial reporting.***

128. The 2019 10-K remarked on Future FinTech's potential for delisting from Nasdaq as follows:

> ***In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").***
>
> On each of April 20, 2016, May 24, 2016 and August 17, 2016, the Company received a notification letter from the staff of the Listing Qualifications Department of NASDAQ (the "Staff") indicating that the Company was not in compliance with NASDAQ's continued listing requirements because the Company was not in compliance with the NASDAQ Listing Rule 5250(c)(1) (the "Rule") with respect to certain of its annual and quarterly reports.
>
> On October 12, 2016, the Company received a delisting determination letter (the "Determination Letter") from the Staff notifying the Company that because the

Company had not filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2015 (the "Form 10-K") and its Quarterly Reports on Form 10-Q for the quarterly periods ended March 31, 2016 and June 30, 2016, (together, the "Reports") by October 11, 2016, the deadline by which the Company was to file all Reports in order to regain compliance with the Rule, the Company's common stock was subject to delisting from the NASDAQ Global Market.

On October 19, 2016, the Company requested a hearing before the NASDAQ Hearings Panel (the "Panel") under Listing Rule 5815(a) to appeal the delisting determination from the Staff. On November 2, 2016, the Company was granted an extended stay as to the suspension of the Company's shares from trading by the Panel until the Company's scheduled hearing before the Panel on December 15, 2016 and issuance of a final Panel decision. Following a hearing, the Panel required that the Company regain compliance by January 31, 2017. By letter dated February 2, 2017, the Panel notified the Company that (i) the Company had regained compliance, (ii) the Company's Common Stock would continue to be listed on the NASDAQ Global Market, and (iii) the Panel was closing the matter.

On December 1, 2017, the Company received written notice from NASDAQ stating that the Company was not in compliance with the requirement of the minimum Market Value of Publicly Held Shares ("MVPHS") of $5,000,000 for continued listing on the NASDAQ Global Market, as set forth in NASDAQ Listing Rule 5450(b)(1)(C). The Company received notice that it had regained compliance on January 4, 2018.

On November 26, 2018, the Company received written notice from the NASDAQ Stock Market stating that the Company was not in compliance with the requirement of maintaining a minimum of $10,000,000 in stockholders' equity for continued listing on the NASDAQ Global Market, as set forth in Nasdaq Listing Rule 5450(b)(1)(A). Alternatively, the Company could consider applying to transfer the Company's securities to the NASDAQ Capital Market, which has a minimum stockholders' equity requirement of $2,500,000.

On December 28, 2018, the Company received confirmation from the Nasdaq Stock Market that its application to transfer the listing of its common stock from the Nasdaq Global Market to the Nasdaq Capital Market (the "Capital Market") had been approved. The Company's common stock began trading on the Capital Market on December 31, 2018.

On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing

Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.

On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K").

On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019.

On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ Listing Qualifications Staff notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the 2018 10-K and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

***On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form [sic] NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1). However, as noted in NASDAQ letter dated December 17, 2019, if the Company fails to evidence such compliance upon filing its Form 10-K for the fiscal year ended December 31, 2019, it may be subject to delisting. At that time, NASDAQ will provide written notification to the Company, which may then appeal Staff's determination to a Hearings Panel.***

129. The statements referenced and identified in ¶¶ 126-128 above were materially false

and misleading, because when they were made, Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate the Company's stock price and prevent it from being delisted from Nasdaq. In addition, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company to substantial legal and regulatory scrutiny. The 2019 10-K also failed to disclose the notice which the Company received from Nasdaq on November 4, 2019, informing it that it was currently not in compliance with the $1 minimum bid price required to be listed.

***November 4, 2020 Form 10-K/A***

130. On November 4, 2020, the Company filed an amendment to the 2019 10-K on Form 10-K/A with the SEC (the "Amended 2019 10-K"). The Amended 2019 10-K was signed by Defendants Huang, Chen, Lau, F. Li, and Zhao, and attached SOX certifications signed by Defendants Huang and Chen. The SOX certifications stated that the Amended 2019 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in [the Amended 2019 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

131. The Amended 2019 10-K contained substantively the same language regarding the Company's potential for delisting from NASDAQ as presented in the 2019 10-K . *See* ¶ 128, *supra*.

132. Also absent from the Amended 2019 10-K was the notice from Nasdaq on November 4, 2019, notifying Future FinTech was not in compliance with the $1 minimum bid price.

133. The statements described in ¶¶ 130-132 were materially false and misleading because, when they were made, Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate the Company's stock price and prevent it from being

delisted from Nasdaq. In addition, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company to substantial legal and regulatory scrutiny. Moreover, the Amended 2019 10-K failed to disclose the notice which the Company received from Nasdaq on November 4, 2019, informing it that it was currently not in compliance with the $1 minimum bid price required to be listed.

***March 12, 2021 SEC Form 3***

134. On March 12, 2021, the Company and Defendant Huang filed the Huang Form 3 which reported, *inter alia*, that on March 4, 2020, Defendant Huang became Future FinTech's CEO.

135. Under the answer for Item 2 of the form, which asked for the "Date of Event Requiring Statement," Defendant Huang answered "03/04/2020." Nevertheless, the tables for securities owned were left blank and in the Explanation of Responses, Defendant Huang stated:

**FORM 3**

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**INITIAL STATEMENT OF BENEFICIAL OWNERSHIP OF SECURITIES**

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0104 |
| Estimated average burden hours per response: | 0.5 |

Filed pursuant to Section 16(a) of the Securities Exchange Act of 1934
or Section 30(h) of the Investment Company Act of 1940

| | | |
|---|---|---|
| 1. Name and Address of Reporting Person* <br> Huang Shanchun <br> (Last) (First) (Middle) <br> 1177 AVENUE OF THE AMERICAS, SUITE 5100 <br> (Street) <br> NEW YORK NY 10036 <br> (City) (State) (Zip) | 2. Date of Event Requiring Statement (Month/Day/Year) <br> 03/04/2020 | 3. Issuer Name and Ticker or Trading Symbol <br> Future FinTech Group Inc. [ FTFT ] <br><br> 4. Relationship of Reporting Person(s) to Issuer (Check all applicable) <br> X Director   10% Owner <br> X Officer (give title below)   Other (specify below) <br> Chief Executive Officer <br><br> 5. If Amendment, Date of Original Filed (Month/Day/Year) <br><br> 6. Individual or Joint/Group Filing (Check Applicable Line) <br> X Form filed by One Reporting Person <br> Form filed by More than One Reporting Person |

**Table I - Non-Derivative Securities Beneficially Owned**

| 1. Title of Security (Instr. 4) | 2. Amount of Securities Beneficially Owned (Instr. 4) | 3. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 4. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|

**Table II - Derivative Securities Beneficially Owned**
**(e.g., puts, calls, warrants, options, convertible securities)**

| 1. Title of Derivative Security (Instr. 4) | 2. Date Exercisable and Expiration Date (Month/Day/Year) | | 3. Title and Amount of Securities Underlying Derivative Security (Instr. 4) | | 4. Conversion or Exercise Price of Derivative Security | 5. Ownership Form: Direct (D) or Indirect (I) (Instr. 5) | 6. Nature of Indirect Beneficial Ownership (Instr. 5) |
|---|---|---|---|---|---|---|---|
| | Date Exercisable | Expiration Date | Title | Amount or Number of Shares | | | |

**Explanation of Responses:**
**No securities are beneficially owned.**

/s/ Shanchun Huang    03/12/2021
** Signature of Reporting Person    Date

Reminder: Report on a separate line for each class of securities beneficially owned directly or indirectly.
* If the form is filed by more than one reporting person, *see* Instruction 5 (b)(v).
** Intentional misstatements or omissions of facts constitute Federal Criminal Violations *See* 18 U.S.C. 1001 and 15 U.S.C. 78ff(a).
Note: File three copies of this Form, one of which must be manually signed. If space is insufficient, *see* Instruction 6 for procedure.
**Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB Number.**

"[n]o securities are beneficially owned[,]." The Huang Form 3 is depicted below:

136. The statements referenced and identified in ¶¶ 134-135 above were materially false and misleading because, prior to the Huang Form 3 having been filed, Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate its price and prevent it from being delisted from Nasdaq. Moreover, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company to substantial legal and regulatory scrutiny.

***April 15, 2021 Form 10-K***

137. On April 15, 2021, Future FinTech filed the 2020 10-K. The 2020 10-K was signed by Defendants Huang, Yi, Zhao, Lau. and F. Li and attached were SOX certifications signed by Defendants Huang and Yi. The SOX certifications stated that the 2020 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in [the 2020 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

138. The 2020 10-K stated the following regarding Future FinTech's potential for delisting from Nasdaq:

> ***In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").***
>
> On February 28, 2019, the Company received a letter from NASDAQ notifying the Company that, because the closing bid price for the Company's common stock listed on NASDAQ was below $1.00 for 30 consecutive trading days, the Company no longer met the minimum bid price requirement for continued listing on NASDAQ under NASDAQ Marketplace Rule 5550(a)(2). On May 7, 2019, the Company received a written notification from the NASDAQ Stock Market Listing Qualifications Staff indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.
>
> On April 17, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule

5250(c)(1), due to its failure to timely file its Annual Report on Form 10-K for the year ended December 31, 2018 (the "2018 10-K"). On May 21, 2019, the Company received a notification letter from NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended March 31, 2019. On August 20, 2019, the Company received a notification letter from the NASDAQ stating the Company was not in compliance with NASDAQ Listing Rule 5250(c)(1), due to its failure to timely file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2019.

On October 16, 2019, the Company received a letter from the NASDAQ notifying the Company that it has regained compliance with NASDAQ's periodic filing requirements for continued listing on the Nasdaq Capital Market. The letter noted that as a result of the September 3, 2019 filing of the Form 10-K for the year ended on December 31, 2018 and the September 30, 2019 filing of the Forms 10-Q for the periods ended March 31, and June 30, 2019 with the Securities and Exchange Commission, the Company has regained compliance with Listing Rule 5250(c)(1) and the matter is now closed.

On September 4, 2019, the Company received written notice from the NASDAQ stating that the Company did not meet the requirement of maintaining a minimum of $2,500,000 in stockholders' equity for continued listing on the NASDAQ Capital Market, as set forth in NASDAQ Listing Rule 5550(b)(1), the Company also does not meet the alternative of market value of listed securities of $35 million under NASDAQ Listing Rule 5550(b)(2) or net income from continuing operations of $500,000 in the most recently completed fiscal year or in two of the last three most recently completed fiscal years under NASDAQ Listing Rule 5550(b)(3), and the Company is no longer in compliance with the NASDAQ Listing Rules. On March 18, 2020, the Company received written notice form [sic] NASDAQ stating that the Company complies with the Listing Rule 5550(b)(1).

***On November 4, 2019, the Company received a letter from the Nasdaq notifying the Company that, because the closing bid price for the Company's common stock listed on Nasdaq was below $1.00 for 30 consecutive trading days, the Company no longer meets the minimum bid price requirement for continued listing on Nasdaq under Nasdaq Marketplace Rule 5550(a)(2), which requires a minimum bid price of $1.00 per share. On April 14, 2020, the Company received a written notification from the Nasdaq indicating that the Company has regained compliance with the $1.00 minimum closing bid price requirement and that the matter is now closed.***

139. The 2020 10-K also addressed the Company's regulations and internal controls, stating the following, in relevant part:

***As a public company, we are obligated to maintain effective internal controls over financial reporting. Our internal controls may be determined not to be effective,***

> ***which may adversely affect investor confidence in us and, as a result, decrease the value of our Common Stock.***
>
> * * *
>
> ***If we become subject to additional scrutiny, criticism and negative publicity involving U.S.-listed China-based companies, we may have to expend significant resources to investigate and resolve the matter which could harm our business operations, this offering and our reputation and could result in a loss of your investment in our shares, especially if such matter cannot be addressed and resolved favorably.***
>
> Recently, U.S. public companies that have substantially all of their operations in China have been the subject of intense scrutiny, criticism and negative publicity by investors, financial commentators and regulatory agencies. ***Much of the scrutiny, criticism and negative publicity has centered around financial and accounting irregularities, a lack of effective internal controls over financial accounting, inadequate corporate governance policies or a lack of adherence thereto and, in some cases, allegations of fraud.*** As a result of the scrutiny, criticism and negative publicity, the publicly traded stock of many U.S.-listed China-based companies has decreased in value and, in some cases, has become virtually worthless. ***Many of these companies have been subject to shareholder lawsuits and SEC enforcement actions and have conducted internal and external investigations into the allegations. On February 21, 2020, the Company has received subpoenas from the SEC's Division of Enforcement requiring us to produce documents and detailed information relating to, among other things, the Company's accounting procedures, management oversight, and the sale of HeDeTang Holdings (HK) Ltd. to New Continent International Co., Ltd.*** The Company has provided responsive documents and information requested in the subpoena. ***It is not clear what effect this sector-wide scrutiny, criticism and negative publicity will have on us and our business. If we become the subject of any unfavorable allegations, whether such allegations are proven to be true or untrue, we will have to expend significant resources to investigate such allegations and/or defend our company.*** This situation may be a major distraction to our management. ***If such allegations are not proven to be groundless, our business operations will be severely hindered and your investment in our shares could be rendered worthless.***

140. The statements referenced and identified in ¶¶ 137-139 above were materially false and misleading because they failed to disclose that Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate the Company's stock price and prevent it from being delisted from Nasdaq. Moreover, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company

to substantial legal and regulatory scrutiny. Further, the 2020 10-K's statements characterizing the risks facing the Company as being hypothetical were false and misleading. In reality, such risks were material given Defendant Huang's manipulative trading of Company stock, and thus not hypothetical. In addition, the statements pertaining to the Company's compliance with Nasdaq regulations were false and misleading, as they failed to disclose that the reason Future FinTech regained compliance was due to Defendant Huang's manipulative trading of Company stock.

***April 15, 2022 Form 10-K***

141. On April 15, 2022, Future FinTech filed its Annual Report on Form 10-K with the SEC, to report its financial and operational results for the year ending December 31, 2021 (the "2021 10-K). The 2021 10-K was signed by Defendants Huang, Yi, Zhao, Lau, Y. Li, and F. Li and attached SOX certifications signed by Defendants Huang and Yi. The SOX certifications stated that the 2021 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in [the 2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

142. The 2021 10-K repeated the same false and misleading statement regarding Future Fintech's potential for delisting from Nasdaq discussed in the 2020 10-K. *See* ¶ 138, *supra*.

143. The 2021 10-K also repeated the same false and misleading statements regarding Future FinTech's regulation and internal controls discussed in the 2020 10-K. *See* ¶ 139, *supra*.

***October 19, 2022 SEC Letter Response***

144. On October 19, 2022, Future FinTech wrote a letter in response to the SEC, attached to which was a draft of an amendment to the 2021 10-K (the "October 2022 SEC Letter"). The October 2022 SEC Letter's drafted amendment repeated the same false and misleading statements regarding the potential for delisting from Nasdaq discussed in the 2020 10-K. *See* ¶ 138, *supra*.

145. The draft attached to the October 2022 SEC Letter also repeated the same false and misleading statements regarding Future FinTech's regulation and internal controls discussed in the 2020 10-K. *See* ¶ 139, *supra*.

***December 16, 2022 SEC Letter Response***

146. On December 16, 2022, Future FinTech wrote a response letter to the SEC which, as in the October 2022 SEC Letter, included a draft of an amendment to the 2021 10-K (the "December 2022 SEC Letter"). The December 2022 SEC Letter's drafted amendment repeated the same false and misleading statements regarding the potential for delisting from Nasdaq discussed in the 2020 10-K. *See* ¶ 138, *supra*.

147. The attachment to the December 2022 SEC Letter also repeated the same false and misleading statements regarding Future FinTech's regulation and internal controls discussed in the 2020 10-K. *See* ¶ 139, *supra*.

***February 14, 2023 SEC Letter Response***

148. On February 14, 2023, Future FinTech wrote a letter to the SEC which also included a draft of an amendment to 2021 10-K (the "February 2023 SEC Letter"). The February 2023 SEC Letter's drafted amendment repeated the same false and misleading statements regarding the potential for delisting from Nasdaq discussed in the 2020 10-K. *See* ¶ 138, *supra*.

149. The attachment to the February 2023 SEC Letter also repeated the same false and misleading statements regarding Future FinTech's regulation and internal controls discussed in the 2020 10-K. *See* ¶ 139, *supra*.

***March 22, 2023 Form 10K/A***

150. On March 22, 2023, Future FinTech filed an amendment to the 2021 10-K on Form 10-K/A with the SEC (the "Amended 2021 10-K"). The Amended 2021 10-K was signed by

Defendants Huang, Yi, Zhao, Lau, Y. Li, and F. Li and attached SOX certifications signed by Defendants Huang and Yi. The SOX certifications stated that the Amended 2021 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in [the Amended 2021 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

151. The Amended 2021 10-K repeated the same false and misleading statements regarding the potential for delisting from Nasdaq discussed in the 2020 10-K. *See* ¶ 138, *supra*.

152. The Amended 2021 10-K also repeated the same false and misleading statements regarding Future FinTech's regulation and internal controls discussed in the 2020 10-K. *See* ¶ 139, *supra*.

153. The statements referenced and identified in ¶¶ 141-152 above were materially false and misleading because they failed to disclose that Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate the Company's stock price and prevent it from being delisted from Nasdaq. Moreover, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company to substantial legal and regulatory scrutiny. Further, the 2020 10-K's statements characterizing the risks facing the Company as being hypothetical were false and misleading. In reality, such risks were material given Defendant Huang's manipulative trading of Company stock, and thus not hypothetical. In addition, the statements pertaining to the Company's compliance with Nasdaq regulations were false and misleading, as they failed to disclose that the reason Future FinTech regained compliance was due to Defendant Huang's manipulative trading of Company stock.

***April 19, 2023 Form 10-K***

154. On April 19, 2023, Future FinTech filed its Annual Report on Form 10-K with the

SEC, to report its financial and operational results for the year ending December 31, 2022 (the "2022 10-K"). The 2022 10-K was signed by Defendants Huang, Yi, Zhao, Lau, Y. Li, and F. Li and attached SOX certifications signed by Defendants Huang and Yi. The SOX certifications stated that the 2022 10-K "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934[,]" and that "[t]he information contained in [the 2022 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

155. The 2022 10-K repeated the same false and misleading statements regarding Future Fintech's potential for delisting from Nasdaq discussed in the 2020 10-K. *See* ¶ 138, *supra*.

156. In addition, the 2022 10-K added the following language about the Nasdaq listing requirement:

> ***In recent years, our Common Stock has been in danger of being delisted from the NASDAQ Stock Market ("NASDAQ").***
>
> ***Our common stock is currently listed on the NASDAQ Capital Market. The NASDAQ Stock Market LLC has requirements that a company must meet in order to remain listed on NASDAQ, for example, NASDAQ rules require us to maintain a minimum bid price of $1.00 per share of our common stock. We may be unable to meet NASDAQ listing requirements, including minimum bid price, minimum levels of stockholders' equity or market values of our common stock in which case, our common stock could be delisted. If our common stock were to be delisted, the liquidity of our common stock would be materially adversely affected and the market price of our common stock could decrease.***

157. The 2022 10-K also repeated the same false and misleading statements regarding Future FinTech's regulation and internal controls discussed in the 2020 10-K. *See* ¶ 139, *supra*.

158. The statements referenced and identified in ¶¶ 154-157 above were materially false and misleading because they failed to disclose that Defendant Huang was engaged in manipulative trading of the Company's stock to artificially inflate the Company's stock price and prevent it from being delisted from Nasdaq. Moreover, Defendant Huang failed to disclose his ownership and transactions of Company stock as required under the Exchange Act, thus exposing the Company

to substantial legal and regulatory scrutiny. Further, the 2022 10-K's statements characterizing the risks facing the Company as being hypothetical were false and misleading. In reality, such risks were material given Defendant Huang's manipulative trading of Company stock, and thus not hypothetical. In addition, the statements pertaining to the Company's compliance with Nasdaq regulations were false and misleading, as they failed to disclose that the reason Future FinTech regained compliance was due to Defendant Huang's manipulative trading of Company stock. Also, the statements pertaining to the hypothetical risks associated with the Company's inability to maintain a minimum bid price for its share were false and misleading, because they failed to disclose that the reason Future FinTech's stock remained in compliance with Nasdaq's minimum bid price was due to Defendant Huang's manipulative trading of Company stock.

**<u>The Truth Emerges</u>**

***January 11, 2024 SEC Press Release***

159. The truth fully emerged on January 11, 2024, after the market closed, when the SEC issued the SEC Press Release. The SEC Press Release stated the following, in relevant part:

> The [SEC] today charged Shanchun Huang with manipulative trading in the stock of Future FinTech Group Inc., using an offshore account shortly before he became Future FinTech's CEO in 2020. The SEC also charged Huang with failing to disclose his beneficial ownership of Future FinTech stock as well as transactions in such stock.
>
> . . . . Huang allegedly used an account in Hong Kong to place trades in Future FinTech stock beginning in January 2020, at a time when Future FinTech was at risk of being delisted from NASDAQ because its stock price had fallen below NASDAQ's minimum bid price requirement of $1.00 per share. Huang allegedly bought more than 530,000 shares of Future FinTech over a two-month period and repeatedly traded at a volume so large that his trades constituted a high percentage of the daily volume of Future FinTech stock transactions. Huang also allegedly placed multiple buy orders in short timeframes, placed limit buy orders with escalating limit prices from one order to the next, and made trades that generally would not make economic sense for an investor seeking to buy the stock at the lowest available price. The SEC's complaint alleges that Huang's trades were intended to, and at times did, push the Future FinTech stock price up.

> For example, on February 6, 2020, when Huang's trading constituted 60 percent of the daily trading volume, he placed multiple buy orders within nine minutes, driving the price up from $0.89 to $1.05, at which point his trading stopped.
>
> Huang was named Future FinTech's CEO in March 2020. Upon becoming CEO of Future FinTech, Huang was required to file initial, annual, and change of ownership forms about his holdings of Future FinTech stock, but he failed to do so for the year after he became CEO. As alleged in the complaint, in March 2021, after he no longer owned any Future FinTech stock, Huang belatedly filed a misleading initial form representing that he owned no Future FinTech stock.
>
> "Timely disclosure of insider stock transactions is a fundamental component of the federal securities laws that ensures the fair operation of our securities markets," said Sheldon L. Pollock, Associate Regional Director of the SEC's New York Regional Office. "CEOs should assume that the use of an offshore account will not prevent the staff of the SEC from identifying manipulative trading."

160. Also attached to the SEC Press Release was the SEC Action complaint. The SEC Action alleges, *inter alia*, that Defendant Huang "***manipulated the stock price of Future FinTech by buying hundreds of thousands of Future FinTech shares to artificially increase the company's stock price shortly before and after he became CEO in March 2020.***"

161. The SEC Action further alleges that "[t]o induce investors to purchase Future FinTech stock, Huang sought to inflate the share price of Future FinTech to avoid the company being delisted by Nasdaq[.]" According to the SEC, Future FinTech was facing delisting due to "its failure to maintain a minimum price of $1 per share, which would have made Future FinTech stock less attractive."

162. On this news, the price per share of the Company's stock fell $0.27, or approximately 20.9%, from a closing price of $1.29 per share on January 11, 2024, to close at $1.02 per share on January 12, 2024.

163. The market responded swiftly with questions about Future FinTech's financial position. For instance, on January 11, 2024, after the market closed, the *Wall Street Journal* released an article announcing, "[t]he SEC seeks fines and to have Huang barred from serving as

an officer or director of a public company . . . The [C]ompany's website didn't appear to be active on Thursday afternoon."

## SUBSEQUENT DEVELOPMENTS

***The SEC Action***

164. As noted above, on January 11, 2024, the SEC filed the SEC Action against Defendant Huang. The SEC Action alleges that Defendant Huang engaged in the manipulative trades of Future FinTech's stock to *inter alia*, inflate the Company's share price. The SEC Action further alleges that Defendant Huang failed to file the necessary SEC filings, such as Form 3, to disclose his ownership and transactions of Company stock from January 2020 through March 2021.

165. The SEC Action asserts claims pursuant to Sections 9(a)(2), 10(b), and 16(a) of the Exchange Act, and Rules 10b-5(a), 10b-5(c), and 16a-3 promulgated thereunder. Moreover, the SEC Action seeks, *inter alia*: (1) a permanent injunction against Defendant Huang to prevent further violations of federal securities laws; (2) civil money penalties pursuant to Section 21(d)(3) of the Exchange Act; and (3) a permanent prohibition against Defendant Huang from serving as an officer or director of any company which possesses a class of securities registered under the Exchange Act.

166. On May 7, 2024, Defendant Huang filed a motion to dismiss the SEC Action. On January 14, 2026, the Court in the SEC Action issued an opinion and order which denied Defendant Huang's motion to dismiss. In its opinion, the Court in the SEC Action found that the SEC, *inter alia*: (1) asserts "more than sufficient [allegations] to plead [Defendant] Huang's knowing involvement in the trading at issue[]"; (2) includes "detailed factual allegations . . . sufficient to plead that [Defendant] Huang intended to mislead the market . . ."; and (3) provides "powerful

evidence that [Defendant Huang] acted with the requisite scienter."

167. On January 28, 2026, Defendant Huang filed an answer to the SEC's complaint. On October 16, 2026, Defendant Huang filed a Motion for Summary Judgment in the SEC Action. As of the time of filing of this complaint, the SEC Action is currently undergoing briefing on Defendant Huang's Motion for Summary Judgment.

***August 9, 2024 Current Report***

168. On August 9, 2024, the Company filed a Current Report on Form 8-K with the SEC, which noted that, on August 5, 2024, the Company received a letter of resignation from Defendant Huang. The letter noted that Defendant Huang resigned as CEO, President, and as a Company director.

***June 25, 2025 Current Report***

169. On June 26, 2025, the Company filed a Current Report on Form 8-K with the SEC, which noted that, on June 25, 2025, the Company received a letter of resignation from Defendant Yi as CFO of Future FinTech. The Current Report also noted that on June 20, 2025, the Company received a letter of resignation from Defendant F. Li as a Company director and a letter of resignation from Defendant Y. Li as Vice President and a Company director.

**<u>THE INDVIDUAL DEFENDANTS' KNOWLEDGE</u>**

170. Throughout the Relevant Period, the Individual Defendants were aware of the materially false and misleading nature of their statements and those statements disseminated in the name of the Company. The Individual Defendants' knowledge of the false and misleading nature of the statements referenced and identified above is demonstrated through, *inter alia*, Defendant Huang's manipulative trading of Company stock and the subsequent SEC Action.

***Defendant Huang's Manipulative Trading of Company Stock***

171. As discussed above, Defendant Huang engaged in substantial trading of Company stock prior to and following his appointment as CEO of Future FinTech. These transactions were purposefully timed to artificially inflate the value of the Company's stock and prevent it from being delisted from Nasdaq. Given that Defendant Huang was the sole account holder for the HSBC securities account which conducted these transactions, he was aware that he was trading in Company stock. Moreover, Defendant Huang was approached to become CEO of the Company around late 2019 or early 2020, which is shortly after the notice from Nasdaq in November 2019 that stated that Future FinTech's stock price was below the minimum bid requirement.

172. Defendant Huang's trading tactics themselves suggest that he was aware of his manipulation of the Company's stock. While investors generally seek to acquire stock at the lowest available price, Defendant Huang frequently purchased Company stock at the top of the NBBO spread. Further, Defendant Huang consistently concealed his trading, having never disclosed his ownership of Company stock as required by the SEC. This cover-up indicates Defendant Huang was aware that his trading tactics were manipulative and for an improper purpose.

173. Ultimately, HSBC closed and liquidated Defendant Huang's securities account following a "comprehensive review," noting that it was "committed to the highest standards in controls against financial crimes[.]" HSBC's actions also indicate Defendant Huang's involvement in and knowledge of his scheme to manipulate the Company's stock price. Notably, the closure of Defendant Huang's HSBC account prompted Future FinTech and Defendant Huang to file the Huang Form 3 with the SEC. However, Defendant Huang continued to misrepresent his ownership of Company stock, stating that he did not own Company shares as of March 4, 2020. As noted above, Defendant Huang's assertion in the Huang Form 3 was untruthful.

174. As a result of Defendant Huang's manipulative trading of Company stock, the SEC

filed the SEC Action against him on January 11, 2024. Notably, on January 14, 2026, the Court delivered an opinion and order denying Defendant Huang's motion to dismiss in the SEC Action. In doing so, the Court held that the allegations that Defendant "Huang was the sole account holder and used the proceeds from the trading in Future FinTech to fund personal expenses and a loan to the [C]ompany . . . it more than sufficient to plead [Defendant] Huang's knowing involvement in the trading at issue." The Court further held that Defendant Huang's "use of manipulative trading techniques is sufficient to support an inference of fraudulent intent[]" and that "his failure to disclose his ownership of Future FinTech stock, as required by the securities laws, is powerful evidence that he acted with the requisite scienter."

175. In connection with his manipulative trading of Company stock, Defendant Huang also loaned Future FinTech a total of $289,000 for the purpose of covering its operating expenses. Defendant Huang's loans were largely funded by his sale of Company stock, namely $259,000 of the $289,000 in total loaned to Future FinTech. Given that Defendant Huang's loans to the Company largely derived from his manipulative trading of Company stock, such loans provide further evidence that Defendant Huang was aware of and engaged in his scheme to artificially inflate Future FinTech's stock price.

***Defendants Chen and Yi were Aware of and Motivated to Support Defendant Huang's Manipulative Trading of Company Stock***

176. Defendant Chen was CFO from May 21, 2019 until November 30, 2020, during which time Defendant Chen was aware of the Nasdaq notice that the Company faced the danger of being delisted due to its failure to meet the minimum bid price of $1.00. Given Defendant Chen's position as CFO and the material risk of being delisted, it is highly likely Defendant Chen had knowledge of Defendant Huang's scheme to artificially inflate the Company's stock price.

177. In addition, Defendant Chen served as the Company's CFO at the same time when

Defendant Huang made loans to the Company, largely by selling shares of Future FinTech stock. Given the direct connection between the loans provided to the Company and Defendant Huang's manipulative trading of Company stock, it is likely that Defendant Chen was aware of Defendant Huang's scheme to artificially inflate Future FinTech's stock price.

178. Likewise, Defendant Yi, as Defendant Chen's successor, would have necessarily been informed of the SEC's investigation into Defendant Huang's trading of Company stock. Notably, the Company's counsel was present during Defendant Huang's testimony for the SEC on April 26, 2021, representing both Defendant Huang and Future FinTech.

179. Further, both Defendant Chen and Defendant Yi were financially motivated to maintain the artificial inflation of the Company's stock created through Defendant Huang's manipulative trading tactics. Given that both Defendant Chen's and Defendant Yi's compensation were largely stock-based, and their salaries were comparatively low, their compensation directly benefited from Defendant Huang's artificial inflation of Future FinTech's stock price.

## THE SECURITIES CLASS ACTION

180. As a result of the misconduct detailed herein, a securities class action was filed against the Company and Defendants Huang, Chen, and Yi in the United States District Court for the District of New Jersey on January 16, 2024, captioned *Labelle v. Future FinTech Group Inc. et al*, Case No. 2:24-cv-00247-JXN. Securities Class Action, Dkt. 1.

181. On July 28, 2025, the lead plaintiff in the Securities Class Action filed an amended complaint. *Id.*, Dkt. 49.

182. On January 20, 2026, the defendants in the Securities Class Action filed a motion to dismiss the amended complaint. *Id.*, Dkt. 65.

183. On September 14, 2026, the Court in the Securities Class Action issued an Opinion

denying the motion to dismiss (the "MTD Opinion"). *Id.*, Dkt 70.

184. Regarding the Securities Class Action claim brought under Section 9(a)(2) of the Exchange Act, the Court found that: (1) "the Amended Complaint adequately alleges [Defendant] Huang made the trades at issue"; and (2) "Plaintiff adequately alleges [Defendant] Huang manipulated the market." *Id* at 17-18. In doing so, the Court held that "the detailed factual allegations in the Amended Complaint 'including patterns of [Defendant] Huang's trading on individual days, are sufficient to plead that Huang intended to mislead the market and drive the price of [Future FinTech] stock higher than it would otherwise have been without his participation in the market.'" *Id* at 18 (quoting *Securities and Exchange Commission v. Huang*, 2026 WL 100752, at *2 (S.D.N.Y., 2026)).

185. Regarding the misleading statements and/or omissions alleged in the Securities Class Action, the Court found that the omission of Defendant Huang's manipulative trading of Company stock from the 2020 10-K, the 2021 10-K, and the 2022 10-K "render[ed] the [r]eports misleading[,]" when juxtaposed with the reports' assertions that the Company had "regained compliance" with Nasdaq's minimum bid price rule. *Id* at 20. As such, the Court held that Defendant "Huang's scheme would have 'significantly altered' the balance of information available to investors," and thus that the "omission [is] material." *Id* at 21.

186. In discussing the statements in the 2020 10-K, the 2021 10-K, and the 2022 10-K pertaining to Future FinTech's regulatory and compliance risks, the Court found that the lead plaintiff in the Securities Class Action "adequately alleges that omitting any reference to [Defendant] Huang's manipulative trading misled investors about the level of risk [the Company] faced." *Id*. More specifically, the Court noted that while the defendants "stated [the Company's] internal controls *might* be deemed inadequate . . . [t]hey did not, however, mention that [the

Company's] internal controls *were* inadequate because [Future FinTech's] CEO was actively manipulating the price of [the Company's] stock." *Id* (emphases in original). The Court once again held that "[t]hese omissions were material, as [Defendant] Huang's price boosting scheme would significantly alter the total mix of information available to an investor." *Id.*

187. In addition, the Court found that the SOX certifications attached to the 2019 10-K, the 2020 10-K, the 2021 10-K, and the 2022 10-K "were misleading" because "[n]one of the [r]eports mentioned [Defendant] Huang's ongoing fraud, despite [Defendants] Huang and Yi's certifications to the contrary[,]" and because "omitting [Defendant] Huang's scheme was material." *Id* at 21-22.

188. The Court further held that the Company's statements pertaining to Defendant Huang's hiring "were misleading," namely the assertions that Defendant Huang had the "right mix of talent, experience and success to lead the Company's next stage of growth" and that Defendant "Huang's significant business experience will be an asset to the Company and the Board." *Id* at 22. The Court noted that such statements created a duty to disclose facts which would make them not misleading. *Id.* However, at the time these statements were made, Defendant "Huang was artificially inflating [the Company's] share price, putting the fate of both [Defendant Huang] and [the Company] in jeopardy." *Id*. Consequently, the Court held that the defendants' "misstatements about [Defendant] Huang's business acumen were material." *Id.*

189. Moreover, the Court held that, because the defendants chose to make statements concerning Defendant Huang's skills, the Company's stock price, the Company's exposure to legal risk, and the accuracy of the Company's SEC filings, they "had a duty to tell the full (if less favorable) story on each issue." *Id* at 23. As such, the Court held that the lead plaintiff in the Securities Class Action "plausibly pleads that [d]efendants made material misstatements and

omissions." *Id*.

190. The Court went on to discuss the allegations of scienter presented in the Securities Class Action. *Id*. In doing so, the Court found that the lead plaintiff in the Securities Class Action "adequately alleges [Defendant] Huang acted with scienter." *Id* at 25. The Court noted that Defendant "Huang solely owned the HSBC account used to trade [Company] stock[,]" which is "'more than sufficient to plead [Defendant] Huang's knowing involvement in the trading at issue.'" *Id.*

191. Additionally, the Court found that the Securities Class Action's "allegations, taken together, support a strong inference of scienter as to [Defendant] Yi." *Id* at 26. The Court noted that the Securities Class Action's "Amended Complaint establishes [Defendant] Yi would have been aware of the investigation into [Defendant] Huang's manipulative trading, particularly because [the Company's] counsel appeared at [Defendant] Huang's [SEC] deposition." *Id* at 27. As such, the Court held that the lead plaintiff in the Securities Class Action "plausibly alleges that [Defendant] Yi . . . was, at the very least, reckless in failing to investigate whether [Defendant] Huang artificially inflated [the Company's] stock price through manipulative trading." *Id.* The Court cited the fact that: (1) Defendant Yi was "an experienced financial executive and public accountant"; (2) Defendant Yi "became CFO of a Company recently at risk of being delisted for its low share price;" and (3) Defendant Yi's "compensation depended, in large part, on [the Company's] stock price[.]" *Id.*

192. Accordingly, the Securities Class Action is proceeding, and the Company will continue to lose and expend millions of dollars in legal fees associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection therewith.

## DAMAGES TO FUTURE FINTECH

193. As a direct and proximate result of the Individual Defendants' misconduct, Future FinTech has lost and will continue to lose and expend many millions of dollars.

194. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

195. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

196. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

197. Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

198. As a direct and proximate result of the Individual Defendants' conduct, Future FinTech has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE AND DEMAND REFUSED ALLEGATIONS

199. Plaintiff brings this action derivatively and for the benefit of Future FinTech to

redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Future FinTech, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of Sections 10(b) and 21D of the Exchange Act.

200. Future FinTech is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

201. Plaintiff is, and has been at all relevant times, a shareholder of Future FinTech. Plaintiff will adequately and fairly represent the interests of Future FinTech in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

202. On July 29, 2026, pursuant to Fla. Stat. Ann. § 607.0742, Plaintiff sent the Board a letter demanding that they recover the damages Future FinTech sustained as a result of the Individual Defendants' misconduct alleged herein and to correct deficiencies in the Company's internal controls that allowed such misconduct to occur. Plaintiff also demanded that the Board assess whether any third parties should be sued, such as Future FinTech's financial advisors, auditors, or attorneys. A true and correct copy of the Demand is attached hereto as **Exhibit A**.

203. Plaintiff demanded the Board investigate, address, remedy, and commence proceedings against certain of the Company's current and former officers and directors for alleged wrongdoing that started well before the Relevant Period. Litigation Demand at 8.

204. Plaintiff demanded that the Board conduct an investigation and take measures to address the harm inflected on the Company, including by commencing a civil action against each responsible individual and entity to recover for the Company the significant damages wrought by the alleged misconduct, assess whether any third parties should be sued, and adopt corporate

governance improvements immediately.

205. On August 11, 2026, the Litigation Demand was delivered to the Company at its headquarters in Hong Kong. Upon receipt of the Litigation Demand, the Board had an affirmative duty to consider and act upon the Litigation Demand in accordance with their fiduciary duties of loyalty, care, and good faith.

206. Under Florida law, absent other circumstances proscribed by the statute, before filing a shareholder derivative suit, a plaintiff must show that they made a demand to the Board and that such demand was "refused, rejected, or ignored by the board of directors prior to the expiration of the 90 days from the date the demand was made." Fla. Stat. Ann. § 607.0742.

207. As of the date of commencing this action, more than 90 days after sending the Litigation Demand, the Board has not provided Plaintiff *any* written or oral response to the Litigation Demand and has not taken any action in response to the Litigation Demand. As far as Plaintiff is aware, the Board has not established any committee to, nor delegated to any existing Board committee, any mandate to investigate the allegations made in the Litigation Demand, nor considered or determined whether pursuing the claims identified in the Litigation Demand is in the best interests of the Company.

208. Instead, the Board has completely ignored the Litigation Demand, failing to act in good faith with due care to properly address the serious allegations raised in the Litigation Demand. Because of the Board's inaction, the Company remains exposed to additional harm from the wrongful conduct described herein. In furtherance of the Company's interests, the Plaintiff now brings this derivative action on behalf of Future FinTech.

## FIRST CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

209. Plaintiff incorporates by reference and re-alleges each and every allegation set forth

above, as though fully set forth herein.

210. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Future FinTech's business and affairs.

211. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

212. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Future FinTech.

213. In breach of their fiduciary duties owed to Future FinTech, the Individual Defendants willfully or recklessly caused the Company to make false and/or misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) Defendant Huang engaged in manipulative trading of Future FinTech's stock to artificially inflate its price and prevent it from being delisted from Nasdaq; (2) the true nature of Defendant Huang's ownership of Future FinTech stock in the Company's SEC filings was misrepresented; (3) the Company's legal risk as it pertained to Defendant Huang's trading of Company stock was understated; (5) the Company failed to maintain internal controls; and (6) as a result of the foregoing, the SEC opened an investigation into Defendant Huang and the Company. As a result of the foregoing, the Company's statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

214. The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

215. Also, in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

216. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Future FinTech's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

217. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

218. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Future FinTech has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

219. Plaintiff, on behalf of Future FinTech, has no adequate remedy at law.

## SECOND CLAIM
## Against the Individual Defendants for Unjust Enrichment

220. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

221. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants

were unjustly enriched at the expense of, and to the detriment of, Future FinTech.

222. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Future FinTech that was tied to the performance or artificially inflated valuation of Future FinTech or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

223. Plaintiff, as a shareholder and a representative of Future FinTech, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

224. Plaintiff, on behalf of Future FinTech, has no adequate remedy at law.

**THIRD CLAIM**
**Against the Individual Defendants for Abuse of Control**

225. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

226. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Future FinTech, for which they are legally responsible.

227. As a direct and proximate result of the Individual Defendants' abuse of control, Future FinTech has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, Future FinTech has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

228. Plaintiff, on behalf of Future FinTech, has no adequate remedy at law.

**FOURTH CLAIM**
**Against the Individual Defendants for Gross Mismanagement**

229. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

230. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Future FinTech in a manner consistent with the operations of a publicly held corporation.

231. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Future FinTech has sustained and will continue to sustain significant damages.

232. As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

233. Plaintiff, on behalf of Future FinTech, has no adequate remedy at law.

**FIFTH CLAIM**
**Against the Individual Defendants for Waste of Corporate Assets**

234. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

235. The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

236. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Future FinTech to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors

and business from future customers who no longer trust the Company and its products.

237. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

238. Plaintiff, on behalf of Future FinTech, has no adequate remedy at law.

## SIXTH CLAIM
## Against Defendants Huang, Chen, and Yi for Contribution Under Sections 10(b) and 21D of the Exchange Act

239. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

240. Future FinTech and Defendants Huang, Chen, and Yi are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 9(a)(2), 9(f), 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Huang's, Defendant Chen's, and Defendant Yi's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

241. Defendants Huang, Chen, and Yi, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

242. Accordingly, Defendants Huang, Chen, and Yi are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

243. As such, Future FinTech is entitled to receive all appropriate contribution or indemnification from Defendants Huang, Chen, and Yi.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a) Declaring that Plaintiff may maintain this action on behalf of Future FinTech, and that Plaintiff is an adequate representative of the Company;

(b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Future FinTech;

(c) Determining and awarding to Future FinTech the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d) Directing Future FinTech and the Individual Defendants to take all necessary actions to reform and improve Future FinTech's corporate governance and internal procedures to comply with applicable laws and to protect Future FinTech and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Future FinTech to nominate at least three candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e) Awarding Future FinTech restitution from the Individual Defendants, and each of them;

(f) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g) Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: November 9, 2026

**THE BROWN LAW FIRM, P.C.**

*/s/ Elizabeth J. Donohoe*
Elizabeth J. Donohoe
Zachary M. Benson
Timothy Brown
1350 Avenue of the Americas, Suite 1200
New York, NY 10019
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: edonohoe@thebrownlawfirm.net
zbenson@thebrownlawfirm.net
tbrown@thebrownlawfirm.net

*Counsel for Plaintiff*

# VERIFICATION

I, Diane Ferro, am a plaintiff in the within action. I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 5th__ day of November, 2026.

Signed by:
E264768260CB49B...
Diane Ferro